IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PACIFIC SENTRY LLC,

        Plaintiff,

    vs.

MEDTRONIC, INC. AND MOZARC
MEDICAL HOLDINGS LLC,

        Defendants.

C.A. No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, PACIFIC SENTRY LLC ("Pacific Sentry") brings this Complaint against Defendants, MEDTRONIC, INC. ("Medtronic") and MOZARC MEDICAL HOLDING LLC ("Mozarc Medical") (collectively, "Defendants").

## NATURE OF THE ACTION

1. This civil action includes claims for federal misappropriation of trade secrets (18 U.S.C. § 1836), state misappropriation of trade secrets (6 *Del. C.* § 2001), correction of inventorship, breach of certain representations and warranties included in a licensing agreement, and fraudulent concealment.

2. Following years of collaboration on a dialysis product incorporating Pacific Sentry's ammonia and pH sensing technology, Pacific Sentry and Medtronic entered into a contract on November 10, 2016, titled "Development and Licensing

Agreement" (the "Agreement"). However, without Pacific Sentry's knowledge and while being bound by a confidentiality agreement with Pacific Sentry, Medtronic filed four patent applications on September 9, 2016 (the "2016 Patent Applications") utilizing the expertise and information gleaned from Pacific Sentry during the parties' collaborative relationship. Medtronic continues to market and sell dialysis products to this day, and in 2023 entered into a $400M joint venture with DaVita Inc. forming Mozarc Medical thereupon assigning these patents to Mozarc Medical on March 28, 2023.

## PARTIES

3.      PACIFIC SENTRY LLC is a limited liability company organized and existing under the laws of the State of Washington with a principal place of business at 7126 180th Avenue NE, Suite C-106, Redmond, WA 98052. Pacific Sentry designs, develops, manufactures, assembles, out-licenses, and sells ammonia and pH sensors for commercial and non-commercial use.

4.      MEDTRONIC, INC. is a corporation organized and existing under the laws of the State of Minnesota with a principal place of business at 710 Medtronic Parkway, Minneapolis, MN 55432. Medtronic manufactures and offers for sale various medical technologies designed to treat several different health conditions. As set forth below, Medtronic misappropriated Pacific Sentry's trade secrets when

2

it filed the 2016 Patent Applications incorporating Pacific Sentry technology during the parties' collaborative relationship.

5.      MOZARC MEDICAL HOLDING LLC is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business at 710 Medtronic Parkway, Minneapolis, MN 55432. Mozarc Medical was created as a joint venture between Medtronic and DaVita Inc. in 2023 with a focus on developing, manufacturing, and selling at-home kidney care technologies – precisely the market and application for which Medtronic licensed Pacific Sentry's technology.

6.      If Medtronic is not exclusively liable for the asserted claims, then on information and belief, Mozarc Medical is jointly and/or severally liable for some or all of the claims.

## JURISDICTION AND VENUE

7.      The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, including the Defend Trade Secret Act (18 U.S.C. § 1836 *et seq.*).

3

9.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because it is a civil action between citizens of different states and the amount in controversy exceeds $75,000.

10.     This Court has supplemental jurisdiction over Pacific Sentry's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Pacific Sentry's federal claim that they form part of the same case or controversy.

11.     This Court has personal jurisdiction over MEDTRONIC, INC. ("Medtronic") because it engages in substantial, continuous, and systematic business in Delaware and its actions – including those directed at Pacific Sentry – caused injury to Pacific Sentry in Delaware. Moreover, Medtronic agreed to adjudicate any disputes arising out of or related to the Agreement between Pacific Sentry and Medtronic in Delaware.

12.     This Court has personal jurisdiction over MOZARC MEDICAL HOLDINGS LLC ("Mozarc") because it is a Delaware company and thus resides in this state.

13.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. Venue is also proper before this Court because at least one Defendant resides in the district.

## GENERAL ALLEGATIONS

<u>Pacific Sentry and Medtronic Enter Into an Agreement to License Pacific Sentry's Proprietary and Trade Secret Technology</u>

14.     Founded in 2006 through a spinoff of existing company Photonic Biosystems Inc., Pacific Sentry is a technology company based in Redmond, Washington. Pacific Sentry was founded by Dr. David Putnam, a leading expert in ammonia and pH sensor systems technology. Over the past three decades Dr. Putnam has conducted extensive research in the field of ammonia detection and has published his work in academic journals. Dr. Putnam has been awarded the New Investigator Research Award from the National Institute of Health and has received funding from the NIH, US Army, and USDA for his research. Dr. Putnam is also the named inventor on 10 issued U.S. Patents in the fields of filtration, ammonia measurement and detection, and sensor technology.

15.     Pacific Sentry specializes in the development and commercialization of low-cost, high-precision sensor technologies, particularly for ammonia and pH sensing in both gas and liquid environments. Pacific Sentry's flagship platform enables continuous, real-time monitoring of ammonia concentrations using proprietary colorimetric sensor chemistries and methodologies for detecting the same. These sensors are designed for durability, accuracy, and affordability, making them suitable for a wide range of applications such as dialysis, medical monitoring and safety, aquaculture, industrial safety, and environmental monitoring.

5

16.    Pacific Sentry sells its own products, and also licenses its ammonia sensor technology to other companies in various industries.

17.    On July 9, 2013, Jabil Circuit, Inc. ("Jabil"), a subcontractor of Medtronic, contacted Pacific Sentry regarding implementing Pacific Sentry's technology for use in a new form of dialysis equipment that Medtronic was interested in developing. These dialysis systems required ammonia and pH sensors to monitor dialysate, a fluid component of dialysis treatment, as it flowed through the equipment, for the ultimate safety of the patient.

18.    On July 12, 2013, Pacific Sentry and Jabil entered into the first of several confidentiality agreements, covering the disclosure of Pacific Sentry's technology and proprietary intellectual property.

19.    During the subsequent year, it became clear that Medtronic would need to be directly involved in the technology development and licensing arrangement with Pacific Sentry. To that end, on August 29, 2014, a new confidential disclosure agreement was executed between Jabil, Medtronic, and Pacific Sentry. The parties executed a third confidentiality agreement on December 19, 2014.

20.    A fourth, and ongoing, confidential disclosure agreement was entered into on November 10, 2016, with a retroactive effective date of December 19, 2015.

21.    At all times under the various confidentiality agreements all parties, including Medtronic and any Medtronic affiliates or assignees, were bound not to

disclose any proprietary, confidential, or trade secret information disclosed pursuant to the confidentiality agreements. The confidentiality agreements had the specific goal of protecting Pacific Sentry's intellectual property relating to its ammonia and pH sensing technology.

22.    Over the next three years (2013-2016), the parties explored various options to implement Pacific Sentry's technology. As part of these explorations, Pacific Sentry disclosed its core trade secrets to Jabil and Medtronic so that Medtronic could establish that Pacific Sentry's technology would work in providing the solution to Medtronic's safety requirements needed for Medtronic's proprietary hemodialysis system console used to perform hemodialysis treatments. Pacific Sentry continued to develop its technology while it was working with Jabil and then Medtronic and made disclosures about its development to Jabil and Medtronic pursuant to the confidentiality agreements. Because Medtronic was convinced that Pacific Sentry's technology would meet the critical ammonia and pH sensing needs, Medtronic and Pacific Sentry reached an agreement to license Pacific Sentry's technology to Medtronic – including several patents, trade secrets, and other know-how – for Medtronic's proprietary hemodialysis system console used to perform hemodialysis treatments.

23.    On November 10, 2016, Pacific Sentry and Medtronic executed the Agreement to license Pacific Sentry's technology and intellectual property to

Medtronic – including several patents, trade secrets, and other confidential, proprietary information, for Medtronic's proprietary hemodialysis system console used to perform hemodialysis treatments – titled "Development and License Agreement" (the "Agreement").

24. The Agreement's stated goals were to have Pacific Sentry continue collaborating with Medtronic to "develop pH and ammonia sensors and a Chemical Sensing System specifically designed to work with Medtronic's proprietary hemodialysis system console ("HDS Console")"; where "Medtronic desires to continue collaboration with … [Pacific Sentry] directly to develop pH and ammonia sensors specifically designed to work with Medtronic's proprietary HDS Console and license [Pacific Sentry's] Patents"; and where "Medtronic also desires [Pacific Sentry's] assistance in (i) developing the Chemical Sensing System to determine pH levels and ammonia concentrations and (ii) establishing the long-term, consistent supply of the Sensor Card Assembly." *See* Agreement §§ Page 1

25. Per the Agreement, Medtronic was granted license to Pacific Sentry's patents, knowhow, trade secrets, and background IP, all of which was to be limited to an enumerated field of use, namely Medtronic's proprietary hemodialysis system console used to perform hemodialysis treatments. *See* Agreement §§ 1.23 (defining "Field of Use"); 1.6 (defining "Chemical Sensing System"); 1.26 (defining "HDS Console"); 6.1.1-6.4.3; 6.6 (defining scope of license). In return, Medtronic was to

8

pay Pacific Sentry a total of $2.9 million after hitting various performance milestones. *Id.* § 4.1.1

26.    In turn, Pacific Sentry was granted exclusive rights, including sublicensing rights, to any/all improvements and IP created during the relationship for use outside of the Field of Use. In other words, the Agreement contemplated a business relationship where Pacific Sentry licensed its technology to Medtronic, who then could adapt and develop the technology, with Pacific Sentry's assistance, within the Field of Use (Medtronic's proprietary hemodialysis system console used to perform hemodialysis treatments). Pacific Sentry would then, in addition to the $2.9 million directly paid under the Agreement, gain the ability to use any such developments and improvements in any other market – fecal incontinence monitoring, agriculture, industrial refrigeration, etc. *See* Agreement §§ 6.5, 6.9. This arrangement anticipated Pacific Sentry receiving far more value for Pacific Sentry than just the license payment because Pacific Sentry would gain the benefit of forthcoming technology development and improvements.

27.    As part of the Agreement, Medtronic represented to Pacific Sentry that it "[had] preserved the Confidentiality of [Pacific Sentry's] Confidential Information between December 19, 2015 and November 8, 2016."

<u>Medtronic Secretly Patents Pacific Sentry's Trade Secrets</u>

28.    Unbeknownst to Pacific Sentry, approximately two months prior to executing the Agreement, Medtronic filed four patent applications with the United States Patent and Trademark Office – Appl. Nos.: 62/385,931 "Gas Bubble Detector," 62/385,940 "Fluid Sensor Card," 62/385,946 "Fluid Sensor Apparatus," and 62/385,949 "Colorimetric Gas Detection" on September 9, 2016 (the "2016 Patent Applications"). Subsequent applications were also filed by Medtronic, including applications that were published by July 12, 2018 (US 2018/0193546 (issued as US 11,013,843)) and July 22, 2021 (US 2021/0220541 (US 11,679,186). These applications contained Pacific Sentry confidential and trade secret information that had been disclosed to Medtronic pursuant to the various confidentiality agreements.

29.    Two of Medtronic's purported inventors of these patents, Christopher Hobot and Martin Gerber, are signatories to certain of the Pacific Sentry- Medtronic confidentiality agreements. In the 2016 Patent Applications, and related subsequent applications, Medtronic disclosed Pacific Sentry's trade secret system related to ammonia & pH sensor technology, including its universally-applicable, field-independent, optical-sensing technique for measuring the same—trade secret and confidential information that Pacific Sentry disclosed to Medtronic pursuant to various confidentiality agreements.

30.     These disclosures are discussed in detail below and include many instances of language cut-and-pasted from Pacific Sentry communications and documents with Jabil and Medtronic.

31.     The 2016 Patent Applications, applied for on September 9, 2016 became publicly accessible eighteen months later in the ordinary course of the patent prosecution process. Thus, on or about March 9, 2018, Pacific Sentry's confidential and trade secret information was published for the world to see. Medtronic never informed Pacific Sentry of the 2016 Patent Applications, including after they become publicly accessible.

32.     Five U.S. patents, as well as several European and Chinese patents, embodying and disclosing Pacific Sentry's trade secrets ultimately issued, including: US 10,664,701 "Gas Bubble Detector" on May 26, 2020; US 11,013,843 "Peritoneal Dialysis Fluid Testing System" on May 25, 2021; US 11,255,831 "Colorimetric Gas Detection" on February 2, 2022; US 11,313,804 "Fluid Sensor Apparatus" on April 26, 2022; and US 11,679,186 "Peritoneal Dialysis Fluid Testing System" on June 20, 2023.

33.     Strikingly, these patents named as inventors certain Medtronic personnel to whom Pacific Sentry had disclosed its trade secret information under confidentiality agreements, and indeed who had been closely involved in the day-to-day work between Pacific Sentry and Medtronic. These claimed Medtronic inventors

11

include David Lura (Senior Program Manager), Martin Gerber (VP R&D, Renal Care Solutions), and Shawn Kelley (Sr. Principal Scientist, Technical Fellow).

34.    Even worse, one of the claimed inventors (Martin Gerber) – who also negotiated the Agreement – had signed the CDA on behalf of Medtronic to obtain Pacific Sentry's trade secret information. All of the claimed inventors had worked closely with Pacific Sentry over several years and were involved in numerous well-documented technology demonstrations and product discussions, were deeply involved in phone & email discussions, in-person meetings, and the overall assessment & evaluation of Pacific Sentry's technology, and were the direct recipients of Pacific Sentry's trade secrets. None of Pacific Sentry's personnel who developed the trade secrets shared with Jabil/Medtronic under terms of confidential disclosure were named as inventors in Medtronic's 2016 Patent Applications or subsequent applications derived from the 2016 Patent Applications.

Medtronic Conceals Its Disclosure of Pacific Sentry's Trade Secrets

35.    After the Agreement was executed in late 2016 and pursuant to its terms, Pacific Sentry spent several more years supporting Medtronic. During this time, Pacific Sentry and Medtronic had monthly scheduled update meetings to discuss the progress of the business relationship and Medtronic's technology development. During these meetings, representatives from Pacific Sentry often requested information regarding Medtronic's efforts to patent related technologies,

12

and Medtronic – often through David Lura, an inventor on several of the Medtronic patents disclosing Pacific Sentry's trade secrets – consistently told Pacific Sentry that there were no relevant patents or other patent-related information. At no time, up to the present date, has Medtronic disclosed the existence of the 2016 Patent Applications, the related subsequent patent applications, or resulting patents that issued beginning in 2018.

36.    Over time, Pacific Sentry's meetings with Medtronic became less frequent, although Medtronic continued making the payments required by the Agreement as each milestone was reached. Pacific Sentry regularly asked Medtronic during update meetings if Medtronic had filed any patent applications related to the technology at issue in the Agreement. Medtronic consistently said they had not, and Pacific Sentry took them at their word.

37.    Pacific Sentry, having no reason to believe that Medtronic breached its ongoing confidentiality obligations, only learned of the 2016 Patent Applications in September 2022. In the summer of 2022, Pacific Sentry entered a commercial negotiation with the water analysis company LaMotte related to aquarium monitors. On or about September 12, 2022, Raymond Putnam of Pacific Sentry decided to conduct research into the state of the overall technology environment in order to demonstrate Pacific Sentry's value to LaMotte. As part of this research, Mr. Putnam reviewed Medtronic's patent portfolio and ran searches relating to ammonia sensors.

13

38.    As a result of this affirmative research, for the first time, Pacific Sentry discovered that Medtronic had been issued patents relating to ammonia and pH sensors. However, Pacific Sentry did not appreciate that Medtronic had misappropriated its trade secrets shared under the CDA until a later, more thorough investigation that began in 2023.

Medtronic and/or Mozarc Continues to Use Pacific Sentry's Technology

39.    On information and belief, and to the best of Pacific Sentry's knowledge, Medtronic and Mozarc Medical continue to use Pacific Sentry's technology in dialysis products to this day.

40.    Medtronic has provided high quality photographs to Pacific Sentry of high-volume manufacturing equipment used to make sensors and sensor cards that utilize Pacific Sentry's technology.

41.    Medtronic has provided status updates and, via Mozarc Medical, paid the final milestone fee of the $2.9 million due under the Agreement. On July 15, 2024, Mozarc Medical informed Pacific Sentry that "we should now execute payment of Fee 3B" and Pacific Sentry did receive that Fee ($300,000) on August 29, 2024. This is critically important because milestone Fee 3B was based on the "Milestone Event" that the "Acceptance Criteria for the Manufacturing Services as identified in the Sensor Card Assembly Manufacturing Requirements is met." That Acceptance Criteria, on page 31 of the Agreement, is as follows:

14

**5. Acceptance Criteria of the Sensor Card Assembly Produced on the High Volume Manufacturing Commercial line**

Acceptance Criteria of the Sensor Card Assembly Manufacturing Requirements shall be:

- Completion of the installation qualification, process qualification, and operation qualification of the high-volume commercial manufacturing of the Sensor Card Assembly and high volume manufacturing equipment for the pH Media and Ammonia Media; and

- Production of three (3) different independent runs of a minimum of fifty (50) Sensor Card Assemblies produced from three (3) different independent runs of pH Media and Ammonia Media from the qualified manufacturing equipment installations ("Lot"). Each Lot shall meet the requirements listed in Exhibit A when inserted into the commercial Chemical Sensing System and tested per the agreed upon test methods between Company and Medtronic.

Page 31 of 36

42. Medtronic / Mozarc Medical was under no obligation to pay this milestone 3B Fee if that exact acceptance criteria was not met. Therefore, the evidence shows both that Pacific Sentry's technology is being used and Pacific Sentry's Sensor Card Assemblies (pH Media and Ammonia Media) is being produced on a high-volume manufacturing commercial line; and the technology successfully provided the solution Medtronic required for their commercial "Chemical Sensing System" because each lot of Sensor Card Assemblies (pH Media and Ammonia Media) had to meet the strict requirements listed in the Agreement when inserted into the Chemical Sensing System. All the qualifications (installation, process, and operation) regarding the high-volume manufacturing line have been completed.

43. Additionally, on information and belief Mozarc also currently uses Pacific Sentry's technology, Medtronic and DaVita launched Mozarc Medical in

15

2023 with each company contributing a $200 million initial investment to focus on kidney care technologies with a specific focus on at-home treatments – precisely the market and application for which Medtronic licensed Pacific Sentry's technology. Shortly after the joint venture, on March 28, 2023, Medtronic assigned at least 24 (twenty-four) patent properties to Mozarc Medical that disclose Pacific Sentry's technology. And Mozarc is the party that communicated to Pacific Sentry that the final Agreement payment was due to be paid. Investigation into how many more patents may be included here is ongoing.

44.   To date, Pacific Sentry has discovered 32 (thirty-two) patent applications filed by Medtronic that disclose Pacific Sentry's technology.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Misappropriation Under and Violation of the DTSA
### 18 U.S.C. § 1836, *et seq.*

45.   Pacific Sentry realleges and incorporates by reference the allegations in paragraphs 1-44 set forth above as if fully set forth herein.

46.   Defendants misappropriated Pacific Sentry's trade secrets, including but not limited to Pacific Sentry's highly confidential ammonia and pH sensor technology and its universally-applicable, field-independent, optical-sensing techniques, by improperly disclosing them in the 2016 Patent Applications that published in March of 2018.

47. Medtronic misappropriated Pacific Sentry's trade secret(s) by disclosing them in four separate patent applications filed in 2016 (the 2016 Patent Applications). Language and diagrams from the various patent applications' specifications and claims can be linked directly to multiple communications from Pacific Sentry to Medtronic and Jabil between 2013 to 2016. These communications contained the very information at the core of Pacific Sentry's trade secrets, subsequently made public by their inclusion in Medtronic's 2016 Patent Applications.

48. For example, Pacific Sentry gave two presentations to Medtronic, including to at least three of the inventors on the subsequent Medtronic patents (derived from the 2016 Patent Applications). The first, a December 2, 2014 presentation given by David Putnam [Pacific Sentry] to (among others) David Lura and Shawn Kelley [Medtronic] – named as inventors on, among others, the '701 and '804 patents – discusses many aspects of the sensor technology, such as the fluid module (i.e. "sampling chamber") that appear in the '701 and '804 Patents. The second, an August 18, 2015 presentation given by David Putnam [Pacific Sentry] to (among others) Martin Gerber [Medtronic] – named as inventor on, among others, the '186, '831, and '843 Patents – discusses many aspects of the sensor technology, such as the ammonia pH card sensor + carrier (i.e. "sensor card") that appear in the

17

'186, '843 Patents, and the colorimetric sensing membrane (i.e. "colorimetric media") that appear in the '831 Patent.

49.    Similarly, on September 16, 2015, Raymond Putnam sent a document to Medtronic memorializing various confidential information Pacific Sentry verbally disclosed to (among others) Medtronic inventors David Lura and Martin Gerber. This information included "sensor and carrier manufacturing processes," and "For this project (the Medtronic/Jabil Dialysis System), two different sensitivities [ammonia sensor types] were chosen." This document also included information about the non-Medtronic markets that Pacific Sentry was targeting.

50.    The trade secrets that were misappropriated include the design of a robust and cost-efficient ammonia/pH sensor measurement system, including the following aspects:

    a.  An ammonia/pH sensor having:

        i.  Specific material composition (Polytetrafluoroethylene (PTFE), dimensions for carriers, adhesives, and membranes)

        ii.  an adhesive-backed membrane;

        iii.  multi-sensor integration with colorimetric membranes for pH and ammonia; including using two different sensitivities of ammonia sensors that "overlap" their detection ranges [this provides a redundancy in sensor readings thereby ensuring

accuracy and reliability for a medical application which has strict performance and safety requirements];

    iv.  barcode for identification and calibration;

    v.  sampling holes for fluid and light access;

    vi.  disposable design for single-use applications.

b.  A measurement system to test the ammonia/pH sensor, which permits:

    i.  dual-sided fluid exposure;

    ii.  a receiving slot in the sampling chamber;

    iii.  optical interrogation via transparent windows; and

    iv.  an optical measuring system that consistently and accurately converts sensor "readings" of color-signal responses into ammonia/pH concentration measurements which determine whether the dialysis system is properly functioning or not, using specific colors and wavelengths.

51.    Defendants used and/or disclosed Pacific Sentry's trade secrets despite knowing or having reason to know that the trade secrets were disclosed by Pacific Sentry under circumstances giving rise to a duty to maintain the secrecy of the trade secrets – demonstrated by the several confidentiality agreements executed by the

parties requiring Medtronic to maintain the confidentiality of the information shared by Pacific Sentry during their collaborative relationship.

52.    Pacific Sentry has taken reasonable efforts to maintain the secrecy of the information shared. Pacific Sentry only divulged its trade secrets subsequent to the execution of a series of confidentiality agreements with Jabil and Medtronic that required each to "hold the Confidential Information of the Disclosing Party in confidence, disclosing Confidential Information only to the other Parties, or to the Receiving Party/ies' employees, agents, representatives, associates, consultants, or affiliates." These agreements clearly defined confidential information as "all confidential and/or proprietary information related to the Purpose of this Agreement which is the property of the Disclosing Party…and is disclosed by the Disclosing Party to the Receiving Party/ies…under this Agreement," followed by a list of various examples of the types of information that may fall under this definition, including designs, plans, processes, and specifications. These agreements also obligated each party to not only return and/or destroy any copies or compilations of the other's confidential information upon written demand, but to also "offer all reasonable cooperation to regain possession and to prevent further loss, dissemination, publication, or disclosure" of any confidential information that had been disclosed in breach of the agreements.

20

53.     Pacific Sentry's intent when entering these agreements was to ensure that its proprietary information stayed confidential throughout the parties' relationship. This intent is evidenced by the "CONFIDENTIAL INFORMATION" and "CONFIDENTIAL" marking that Pacific Sentry included on proprietary documents, data, presentations, and reports provided by Pacific Sentry. This intent is also evidenced by Pacific Sentry memorializing Pacific Sentry's verbal disclosure of confidential information and providing said disclosure to Medtronic within the required 30-day window. This intent is further evidenced by a "confidentiality notice" included in the signature block of each email sent by Pacific Sentry, with the goal of ensuring the email, and its attachments, were kept confidential by the email's recipient. Given the nature of the relationship between Medtronic and Pacific Sentry, two separate entities exploring the potential for a collaborative product, the use of confidentiality agreements and a perpetual "reminder" that the information shared by Pacific Sentry should not be disclosed to any third parties is a reasonable effort to maintain the secrecy of its trade secrets.

54.     At no point did Pacific Sentry provide consent, written or otherwise, for Medtronic to disclose its trade secrets in the 2016 Patent Applications.

55.     Pacific Sentry's trade secrets derive independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable by proper means by third parties, including who can obtain economic

value from their disclosure or use. Defendants, or any other competitor, can obtain economic value from knowing the details of and exploiting Pacific Sentry's ammonia and pH sensor technology.

56.    After multiple years of collaboration between Pacific Sentry and Medtronic, the parties entered into a fully executed "Development and License Agreement," under which Medtronic was willing to pay almost $3,000,000 for a "grant of License to the Company (Pacific Sentry) Licensed Technology," defined under the same Agreement as "Company Background Intellectual Property, Company Knowhow, Licensed Patents, Company Background Technical Information, and Company Technical Information." Furthermore, this "grant of License to the Company (Pacific Sentry) Licensed Technology" was limited to only a very narrow application, e.g. Medtronic's "HDS Console," defined under the same Agreement as "Medtronic's proprietary hemodialysis system console used to perform hemodialysis treatments." The Agreement alone demonstrates that the information shared by Pacific Sentry had an independent economic value, given that another company was willing to pay almost $3,000,000 for the ability to use it, and for such a narrow application.

57.    As documented throughout the business relationship between Pacific Sentry and Medtronic, Pacific Sentry demonstrated substantial time, resources, expertise, and experimentation required to develop its trade secrets.

58.    Pacific Sentry's trade secrets being publicly known after Medtronic's unlawful disclosure has drastically lowered the value of Pacific Sentry's business, its business opportunities, and its licensing opportunities or destroyed them entirely.

59.    Pacific Sentry's trade-secret system is valuable in that it solves the problem of providing a robust, cost-effective solution for continuously monitoring ammonia and pH levels. For example, Medtronic uses the trade secrets in medical devices designed to perform dialysis treatment in a home setting using a recirculating dialysis treatment-fluid, which is a much more convenient and cost-effective alternative to having to go to a dialysis treatment center.

60.    The ammonia and pH sensing capabilities are vital for ensuring the proper operation of the dialysis process, and most importantly, for the patient's safety, to prevent them from being exposed to dangerously high levels of toxic ammonia if there was a process failure. The ammonia/pH sensor solution Pacific Sentry provided is better than the alternatives because the alternatives were: a) not easily integrated into a portable dialysis unit; b) not easily operated and maintained; c) not robust enough to measure ammonia/pH in the medical environment of the dialysis treatment Medtronic sought to deliver; d) unable to survive the dialysate and exposure to the dialysis-equipment cleaning and disinfection fluids; and/or e) cost prohibitive for the commercial viability of the product.

61.    On August 8, 2015, during an onsite meeting between Medtronic and Pacific Sentry, with multiple witnesses present from Medtronic's and Pacific Sentry's side, Medtronic – through Todd Dhavale, now head of Strategy and Business Development at Mozarc Medical – verbally disclosed that they did not have any alternatives to Pacific Sentry's sensor technology and their device would not launch without having such a sensor system incorporated into their device.

62.    Pacific Sentry's trade secrets are not apparent because the monitoring of ammonia/pH in a solution involves controlling for many different factors that are not easily ascertainable or readily reverse engineered. For example, one of Pacific Sentry's innovations was to optically use a transmissive-mode of reading "through" the sensor to derive an ammonia concentration-dependent color signal measurement, as opposed to reading the color signal bouncing off the "front" of the sensor in a light-reflectance mode. With Pacific Sentry's transmissive approach, the interrogation light is directed at one surface of the sensor film, passes through the film wherein the light interacts with the ammonia sensitive dye molecules incorporated in the film, then exits the other side of the film where the residual signal throughput is captured with a photodetector (camera based image-sensor in Pacific Sentry's preferred method). Since the sensor material is not transparent, but rather translucent at best, and is loaded with the sensory dye, it is not obvious that light of the necessary wavelengths would sufficiently pass through the thickness of the

24

sensor material with the intensity that could be efficiently read with an optical detector/camera.

63.    As another technical example, it was not generally known that with light passing through the matrix and being absorbed by the dye therein, it would provide a more rigorous filtering and modulation of the light, such that the signal light transmitted is to a greater degree affected by traversing the entire bed (thickness) of the film matrix, thereby yielding a more sensitive signal measurement. In contrast, when using the reflectance signal approach, the interrogation light just impinges on the front surface of the sensor film, penetrates a finite distance into the bed of the matrix where it is affected by some of the dye, then a small fraction of that light gets scattered by the matrix such that it is reflected back out of the sensor front of the sensor. Only a small portion of that reflected light is finally received and measured by the photodetector. The reflectance approach is thus less efficient, is also complicated by variables in the optical path which alter and interfere with the sensor scattering properties, and moreover, it has to contend with large amounts of source light being directly reflected back from the front of the film, w/o ever entering the film, which swamp and interfere with measuring true sensor response signal associated with the small component of light reflected from the dye.

64.    That Medtronic, a multi-billion-dollar company with extensive R&D capabilities, entered into a $2.9 million Agreement with Pacific Sentry after working

with Pacific Sentry's technology for several years is strong evidence that the technology and trade secret methods and processes were not simple or readily ascertainable.

65.    Defendants used, and continue to sell, dialysis products incorporating Pacific Sentry's trade secrets across the United States and internationally through channels involving interstate commerce. Additionally, Pacific Sentry sells products and licenses its technology in interstate commerce, and so Medtronic's unlawful disclosure of its trade secrets damaged the value of Pacific Sentry's interstate commercial activities.

66.    Defendants willfully and maliciously acquired, used, and disclosed Pacific Sentry's trade secrets. As a result, Pacific Sentry has suffered actual damages in the form of the actual loss caused by the misappropriation, the unjust enrichment caused by the misappropriation that is not taken into account in computing the actual loss, and the lost business opportunities caused by the potential for infringement of Medtronic's wrongfully-acquired patents.

## SECOND CAUSE OF ACTION

### Misappropriation Under and Violation of the DUTSA
### 6 *Del. C.* § 2001, *et seq.*

67.    Pacific Sentry realleges and incorporates by reference the allegations in paragraphs 1-66 set forth above as if fully set forth herein.

68.    Defendants misappropriated Pacific Sentry's trade secrets, including but not limited to Pacific Sentry's highly confidential ammonia and pH sensor technology and its universally-applicable, field-independent, optical-sensing techniques, by improperly disclosing them in the 2016 Patent Applications that published in March of 2018.

69.    Medtronic misappropriated Pacific Sentry's trade secret(s) by disclosing them in four separate patent applications filed in 2016 (the 2016 Patent Applications). Language and diagrams from the various patent applications' specifications and claims can be linked directly to multiple communications from Pacific Sentry to Medtronic and Jabil between 2013 to 2016. These communications contained the very information at the core of Pacific Sentry's trade secrets, subsequently made public by their inclusion in Medtronic's 2016 Patent Applications.

70.    For example, Pacific Sentry gave two presentations to Medtronic, including to at least three of the inventors on the subsequent Medtronic patents (derived from the 2016 Patent Applications). The first, a December 2, 2014 presentation given by David Putnam [Pacific Sentry] to (among others) David Lura and Shawn Kelley [Medtronic] – named as inventors on, among others, the '701 and '804 patents – discusses many aspects of the sensor technology, such as the fluid module (i.e. "sampling chamber") that appear in the '701 and '804 Patents. The

second, an August 18, 2015 presentation given by David Putnam [Pacific Sentry] to (among others) Martin Gerber [Medtronic] – named as inventor on, among others, the '186, '831, and '843 Patents – discusses many aspects of the sensor technology, such as the ammonia pH card sensor + carrier (i.e. "sensor card") that appear in the '186, '843 Patents, and the colorimetric sensing membrane (i.e. "colorimetric media") that appear in the '831 Patent.

71.    Similarly, on September 16, 2015, Raymond Putnam sent a document to Medtronic memorializing various confidential information Pacific Sentry verbally disclosed to (among others) Medtronic inventors David Lura and Martin Gerber. This information included "sensor and carrier manufacturing processes," and "For this project (the Medtronic/Jabil Dialysis System), two different sensitivities [ammonia sensor types] were chosen." This document also included information about the non-Medtronic markets that Pacific Sentry was targeting.

72.    The trade secrets that were misappropriated include the design of a robust and cost-efficient ammonia/pH sensor measurement system, including the following aspects:

    a.  An ammonia/pH sensor having:

        i.  Specific material composition (Polytetrafluoroethylene (PTFE), dimensions for carriers, adhesives, and membranes)

        ii.  an adhesive-backed membrane;

28

    iii. multi-sensor integration with colorimetric membranes for pH and ammonia; including using two different sensitivities of ammonia sensors that "overlap" their detection ranges [this provides a redundancy in sensor readings thereby ensuring accuracy and reliability for a medical application which has strict performance and safety requirements];

    iv. barcode for identification and calibration;

    v. sampling holes for fluid and light access;

    vi. disposable design for single-use applications.

b. A measurement system to test the ammonia/pH sensor, which permits:

    i. dual-sided fluid exposure;

    ii. a receiving slot in the sampling chamber;

    iii. optical interrogation via transparent windows; and

    iv. an optical measuring system that consistently and accurately converts sensor "readings" of color-signal responses into ammonia/pH concentration measurements which determine whether the dialysis system is properly functioning or not, using specific colors and wavelengths.

73.    Defendants used and/or disclosed Pacific Sentry's trade secrets despite knowing or having reason to know that the trade secrets were disclosed by Pacific Sentry under circumstances giving rise to a duty to maintain the secrecy of the trade secrets – demonstrated by the several confidentiality agreements executed by the parties requiring Medtronic to maintain the confidentiality of the information shared by Pacific Sentry during their collaborative relationship.

74.    Pacific Sentry has taken reasonable efforts to maintain the secrecy of the information shared. Pacific Sentry only divulged its trade secrets subsequent to the execution of a series of confidentiality agreements with Jabil and Medtronic that required each to "hold the Confidential Information of the Disclosing Party in confidence, disclosing Confidential Information only to the other Parties, or to the Receiving Party/ies' employees, agents, representatives, associates, consultants, or affiliates." These agreements clearly defined confidential information as "all confidential and/or proprietary information related to the Purpose of this Agreement which is the property of the Disclosing Party…and is disclosed by the Disclosing Party to the Receiving Party/ies…under this Agreement," followed by a list of various examples of the types of information that may fall under this definition, including designs, plans, processes, and specifications. These agreements also obligated each party to not only return and/or destroy any copies or compilations of the other's confidential information upon written demand, but to also "offer all

30

reasonable cooperation to regain possession and to prevent further loss, dissemination, publication, or disclosure" of any confidential information that had been disclosed in breach of the agreements.

75.    Pacific Sentry's intent when entering these agreements was to ensure that its proprietary information stayed confidential throughout the parties' relationship. This intent is evidenced by the "CONFIDENTIAL INFORMATION" and "CONFIDENTIAL" marking that Pacific Sentry included on proprietary documents, data, presentations, and reports provided by Pacific Sentry. This intent is also evidenced by Pacific Sentry memorializing Pacific Sentry's verbal disclosure of confidential information and providing said disclosure to Medtronic within the required 30-day window. This intent is further evidenced by a "confidentiality notice" included in the signature block of each email sent by Pacific Sentry, with the goal of ensuring the email, and its attachments, were kept confidential by the email's recipient. Given the nature of the relationship between Medtronic and Pacific Sentry, two separate entities exploring the potential for a collaborative product, the use of confidentiality agreements and a perpetual "reminder" that the information shared by Pacific Sentry should not be disclosed to any third parties is a reasonable effort to maintain the secrecy of its trade secrets.

76.    At no point did Pacific Sentry provide consent, written or otherwise, for Medtronic to disclose its trade secrets in the 2016 Patent Applications.

77.    Pacific Sentry's trade secrets derive independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable by proper means by third parties, including who can obtain economic value from their disclosure or use. Defendants, or any other competitor, can obtain economic value from knowing the details of and exploiting Pacific Sentry's ammonia and pH sensor technology.

78.    After multiple years of collaboration between Pacific Sentry and Medtronic, the parties entered into a fully executed "Development and License Agreement," under which Medtronic was willing to pay almost $3,000,000 for a "grant of License to the Company (Pacific Sentry) Licensed Technology," defined under the same Agreement as "Company Background Intellectual Property, Company Knowhow, Licensed Patents, Company Background Technical Information, and Company Technical Information." Furthermore, this "grant of License to the Company (Pacific Sentry) Licensed Technology" was limited to only a very narrow application, e.g. Medtronic's "HDS Console," defined under the same Agreement as "Medtronic's proprietary hemodialysis system console used to perform hemodialysis treatments." The Agreement alone demonstrates that the information shared by Pacific Sentry had an independent economic value, given that another company was willing to pay almost $3,000,000 for the ability to use it, and for such a narrow application.

79.     As documented throughout the business relationship between Pacific Sentry and Medtronic, Pacific Sentry demonstrated substantial time, resources, expertise, and experimentation required to develop its trade secrets.

80.     Pacific Sentry's trade secrets being publicly known after Medtronic's unlawful disclosure has drastically lowered the value of Pacific Sentry's business, its business opportunities, and its licensing opportunities or destroyed them entirely.

81.     Pacific Sentry's trade-secret system is valuable in that it solves the problem of providing a robust, cost-effective solution for continuously monitoring ammonia and pH levels. For example, Medtronic uses the trade secrets in medical devices designed to perform dialysis treatment in a home setting using a recirculating dialysis treatment-fluid, which is a much more convenient and cost-effective alternative to having to go to a dialysis treatment center.

82.     The ammonia and pH sensing capabilities are vital for ensuring the proper operation of the dialysis process, and most importantly, for the patient's safety, to prevent them from being exposed to dangerously high levels of toxic ammonia if there was a process failure. The ammonia/pH sensor solution Pacific Sentry provided is better than the alternatives because the alternatives were: a) not easily integrated into a portable dialysis unit; b) not easily operated and maintained; c) not robust enough to measure ammonia/pH in the medical environment of the dialysis treatment Medtronic sought to deliver; d) unable to survive the dialysate and

33

exposure to the dialysis-equipment cleaning and disinfection fluids; and/or e) cost prohibitive for the commercial viability of the product.

83.    On August 8, 2015, during an onsite meeting between Medtronic and Pacific Sentry, with multiple witnesses present from Medtronic's and Pacific Sentry's side, Medtronic – through Todd Dhavale, now head of Strategy and Business Development at Mozarc Medical – verbally disclosed that they did not have any alternatives to Pacific Sentry's sensor technology and their device would not launch without having such a sensor system incorporated into their device.

84.    Pacific Sentry's trade secrets are not apparent because the monitoring of ammonia/pH in a solution involves controlling for many different factors that are not easily ascertainable or readily reverse engineered. For example, one of Pacific Sentry's innovations was to optically use a transmissive-mode of reading "through" the sensor to derive an ammonia concentration-dependent color signal measurement, as opposed to reading the color signal bouncing off the "front" of the sensor in a light-reflectance mode. With Pacific Sentry's transmissive approach, the interrogation light is directed at one surface of the sensor film, passes through the film wherein the light interacts with the ammonia sensitive dye molecules incorporated in the film, then exits the other side of the film where the residual signal throughput is captured with a photodetector (camera based image-sensor in Pacific Sentry's preferred method). Since the sensor material is not transparent, but rather

34

translucent at best, and is loaded with the sensory dye, it is not obvious that light of the necessary wavelengths would sufficiently pass through the thickness of the sensor material with the intensity that could be efficiently read with an optical detector/camera.

85.    As another technical example, it was not generally known that with light passing through the matrix and being absorbed by the dye therein, it would provide a more rigorous filtering and modulation of the light, such that the signal light transmitted is to a greater degree affected by traversing the entire bed (thickness) of the film matrix, thereby yielding a more sensitive signal measurement. In contrast, when using the reflectance signal approach, the interrogation light just impinges on the front surface of the sensor film, penetrates a finite distance into the bed of the matrix where it is affected by some of the dye, then a small fraction of that light gets scattered by the matrix such that it is reflected back out of the sensor front of the sensor. Only a small portion of that reflected light is finally received and measured by the photodetector. The reflectance approach is thus less efficient, is also complicated by variables in the optical path which alter and interfere with the sensor scattering properties, and moreover, it has to contend with large amounts of source light being directly reflected back from the front of the film, w/o ever entering the film, which swamp and interfere with measuring true sensor response signal associated with the small component of light reflected from the dye.

86.    That Medtronic, a multi-billion-dollar company with extensive R&D capabilities, entered into a $2.9 million Agreement with Pacific Sentry after working with Pacific Sentry's technology for several years is strong evidence that the technology and trade secret methods and processes were not simple or readily ascertainable.

87.    Defendants willfully and maliciously acquired, used, and disclosed Pacific Sentry's trade secrets. As a result, Pacific Sentry has suffered actual damages in the form of the actual loss caused by the misappropriation, the unjust enrichment caused by the misappropriation that is not taken into account in computing the actual loss, and the lost business opportunities caused by the potential for infringement of Medtronic's wrongfully acquired patents.

## THIRD CAUSE OF ACTION

### Delaware Common Law Breach of Contract

88.    Pacific Sentry realleges and incorporates by reference the allegations in paragraphs 1-87 set forth above as if fully set forth herein.

89.    On or about November 10, 2016, Pacific Sentry and Medtronic entered into the Agreement. The Agreement is an enforceable contract.

90.    Under the Agreement, both Pacific Sentry and Medtronic "assure[ed] the other Parties that they [were] not aware of any breaches by the other Parties and that they [had] preserved the Confidentiality of the other Parties Confidential

36

Information between December 19, 2015 and November 8, 2016 under the terms of the 3rd CDA."

91. Medtronic breached the Agreement by making this misrepresentation, because it knew and/or had reason to know it had already disclosed Pacific Sentry's confidential and proprietary information by virtue of its inclusion in Medtronic's 2016 Patent Applications. All four of the patent applications (the 2016 Patent Applications) at issue were filed on September 9, 2016 – two months prior to the signing of the Agreement and clearly within the period between December 19, 2015 and November 8, 2016.

92. Pacific Sentry had a strong interest in ensuring its confidential information remained confidential throughout the duration of the parties' relationship, as evidenced by the several confidentiality agreements executed prior to the Agreement. As such, Medtronic's representation that it had not, and would not, disclose Pacific Sentry's confidential information contributed significantly to Pacific Sentry's decision to enter the Agreement.

93. Pacific Sentry's reliance on Medtronic's assertion that it had not disclosed Pacific Sentry's confidential information was justified.

94. Pacific Sentry did not breach any of its obligations under the Agreement. Rather, Pacific Sentry has fulfilled all of its obligations under the Agreement.

37

95.    As a result of the foregoing, Pacific Sentry has sustained damages and will continue to sustain damages.

### FOURTH CAUSE OF ACTION

### Delaware Common Law Fraudulent Concealment

96.    Pacific Sentry realleges and incorporates by reference the allegations in paragraphs 1-95 set forth above as if fully set forth herein.

97.    As set forth, Medtronic intentionally concealed and/or intentionally failed to disclose that it had already included Pacific Sentry's confidential information in the 2016 Patent Applications.

98.    In fact, not only did Medtronic fail to disclose this information, but it made several affirmative, contradictory representations to Pacific Sentry both in the Agreement and throughout the parties' subsequent relationship, including but not limited to:

(a) Specifically stating that it "[had] preserved the Confidentiality of the other Parties Confidential Information between December 19, 2015 and November 8, 2016 under the terms of the 3rd CDA" despite putting this same information in soon-to-be-publicly available patent applications just two months prior.

(b) Continued representations by Medtronic employees that there were no updates on any patents or patent protections based on the technology being developed by the parties. For example, a September 2, 2020 PowerPoint

38

presentation by Medtronic titled "PH AMMONIA PACIFIC SENTRY MONTHLY UPDATE" lists "Patent protection" as an open agenda item to be discussed with Pacific Sentry. This PowerPoint was shared in a September 2, 2020 email exchange between Pacific Sentry and David B. Lura, an employee of Medtronic, in which Mr. Lura stated he "do[es] not have any updates on" patent protections.

99. These affirmative misrepresentations prevented Pacific Sentry from discovering that Medtronic had already disclosed Pacific Sentry's confidential information in the 2016 Patent Applications. In fact, as of the September 2, 2020 email exchange, one of the patents had already issued – specifically, US 10,664,701 "Gas Bubble Detector" which issued on May 26, 2020. David Lura is listed as an inventor on this patent, and on information and belief had personal knowledge of the patent's issuance mere months before assuring Pacific Sentry that no relevant patents existed.

100. Pacific Sentry reasonably relied on Medtronic's knowing and intentional omissions and concealment to its detriment. The Agreement, the several confidentiality agreements executed throughout the parties' relationship, and the various affirmative, contradictory representations made by Medtronic resulted in Pacific Sentry's trusting that Medtronic was continuing to protect its confidential and trade secret information – just as it was contractually bound to do.

101.   Had Pacific Sentry known of the information that Medtronic concealed, Pacific Sentry would have immediately abandoned the parties' relationship and sought to protect its trade secrets and other confidential information.

102.   If Medtronic, and David Lura, had not affirmatively misrepresented that no relevant patents existed, Pacific Sentry likely would have been aware of Medtronic's disclosure and misappropriation years earlier.

103.   As a result of the foregoing, Pacific Sentry has suffered actual damages in the form of the actual loss caused by the fraudulent concealment. Among other damages, Pacific Sentry would have had rights to Medtronic's patents and would have been able to license them for many years. While Pacific Sentry's trade secrets were more valuable when not known to the general public, Pacific Sentry would have been able to recoup some value had it been able to license the patents from their issuance in 2018.

## FIFTH CAUSE OF ACTION

### Correction Of Inventorship Pursuant To 35 U.S.C. § 256

104.   Pacific Sentry realleges and incorporates by reference the allegations in paragraphs 1-103 set forth above as if fully set forth herein.

105.   Plaintiffs Raymond and David Putnam ("the Putnams") are the true inventors of the subject matter claimed in U.S. Patent Nos US 10,664,701 "Gas Bubble Detector"; US 11,013,843 "Peritoneal Dialysis Fluid Testing System"; US

40

11,255,831 "Colorimetric Gas Detection"; US 11,313,804 "Fluid Sensor Apparatus"; and US 11,679,186 "Peritoneal Dialysis Fluid Testing System."

106.   US 10,664,701 issued on May 26, 2020 and lists as inventors Martin Gerber, David Lura, and Shawn Kelley; US 11,013,843 issued on May 25, 2021 and lists as inventors Martin Gerber and Christopher Hobot; US 11,255,831 issued on February 2, 2022 and lists as inventors Martin Gerber, David Lura, and Shawn Kelley; US 11,313,804 issued on April 26, 2022 and lists as inventors David Lura, Shawn Kelley, and Martin Gerber; and US 11,679,186 issued on June 20, 2023 and lists as inventors Martin Gerber and Christopher Hobot.

107.   The Putnams contributed to the conception of at least one claim of each of these patents and therefore qualify as inventors under United States patent law.

108.   The Putnams' contribution to the invention is corroborated by voluminous correspondence between them and the listed inventors.

109.   The Putnams were erroneously omitted from the list of inventors due to Medtronic's secret inclusion of Pacific Sentry's trade secrets.

110.   Pursuant to 35 U.S.C. § 256, the court has authority to order correction of inventorship in an issued patent upon notice and hearing of all parties concerned.

111.   The Putnams have standing to bring this claim as omitted inventors and seek an order from this Court directing the United States Patent and Trademark Office to issue a certificate correcting the inventorship of the Patent to include the

41

Putnams. Pacific Sentry has standing to bring the claim on behalf of the Putnams because Pacific Sentry has a concrete financial interest in the Putnams being properly named as inventors on U.S. Patent Nos. US 10,664,701, US 11,013,843, US 11,255,831, US 11,313,804, and US 11,679,186. The Putnams, if properly named as inventors, would assign and/or otherwise permit Pacific Sentry to license or otherwise monetize the patents.

112.   The Putnams have been harmed as a result of the omission, including: by loss of recognition for their inventions, loss of opportunity to engage in business development and/or selling new products, and inability to license their intellectual property for its proper value.

## EQUITABLE TOLLING

113.   Pacific Sentry asserts all applicable statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, delayed discovery, discovery rule, and/or fraudulent concealment.

114.   Fraudulent concealment applies to toll the running of the statute of limitations until a plaintiffs knows, or though the exercise of reasonable care and diligence should have known, of facts that the plaintiff had been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

115. The nature of Pacific Sentry's injuries, damages, or their causal relationship to Medtronic's conduct was not discovered, and through reasonable care and due diligence, could not have been discovered until a date within the applicable statute of limitations for filing Pacific Sentry's claims.

116. As such, the running of the statute of limitations is tolled due to equitable tolling. Defendants are estopped from relying on any statutes of limitations or repose by virtue of their acts of fraudulent concealment, through affirmative misrepresentations and omissions to Pacific Sentry. Medtronic affirmatively withheld and/or misrepresented facts concerning its actions with regard to filing patent applications containing Pacific Sentry's trade secrets. As set forth, as a result of Medtronic's misrepresentations and concealment, Pacific Sentry could not have learned through reasonable diligence that Medtronic had filed these patent applications until 2023.

117. Given Medtronic's affirmative acts of concealment, Defendants are estopped from relying on any statues of limitations or repose that might otherwise be applicable to the claims asserted herein.

## RELIEF REQUESTED

WHEREFORE, Pacific Sentry prays for relief as follows:

A.    An injunction against Medtronic and Mozarc Medical preventing them from further misappropriation of Pacific Sentry's trade secrets under Federal and Delaware law;

B.    An accounting of damages and judgment thereon resulting from Medtronic's and Mozarc Medical's misappropriation of trade secrets including, without limitations: actual damages, compensatory damages, consequential damages, unjust enrichment, a reasonable royalty, exemplary damages in an amount of twice the total of the actual loss, the unjust enrichment, and the reasonably royalty including lost profits, attorneys' fees, costs, and interest;

C.    For an award of reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) and related controlling legal authority, given Pacific Sentry's "trade secret[s] w[ere] willfully and maliciously appropriated []";

D.    For an award of reasonable attorneys' fees pursuant to 6 *Del. C.* § 2004 and related controlling authority, given that "willful and malicious misappropriation exists" with regard to Pacific Sentry's trade secrets;

E.    An accounting for damages and judgment thereon resulting from Medtronic's breach of the Agreement;

44

F.      Correction of Inventorship Pursuant to 35 U.S.C. § 256; and

G.      Such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pacific Sentry elects a trial by jury of any issues and claims in this action to which it is entitled.

Dated:  August 29, 2025                                          BAKER & HOSTETLER LLP

                                                                                  /s/ *Jeffrey J. Lyons*
                                                                                  Jeffrey J. Lyons (#6437)
                                                                                  1201 North Market Street, Suite 1407
                                                                                  Wilmington, DE 19801
                                                                                  (302) 407-4222
                                                                                  jjlyons@bakerlaw.com

                                                                                  *Attorneys for Plaintiff Pacific Sentry LLC*

45